## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE
c/o Mayer Brown LLP
1999 K Street, NW
Washington, DC 20006-1101

                          Plaintiff,

             v.

UNITED STATES DEPARTMENT OF STATE,
2201 C Street NW,
Room 4330,
Washington, DC 20037,

          and

JOHN F. KERRY
c/o United States Department of State
2201 C Street NW, Room 4330
Washington, DC 20037,

          and

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,
3801 Nebraska Avenue NW,
Washington, DC 20016,

          and

JEH JOHNSON
c/o United States Department of Homeland
Security,
3801 Nebraska Avenue NW,
Washington, DC 20016,

                         Defendants.

**COMPLAINT FOR WRIT OF
MANDAMUS AND FOR ORDER
COMPELLING AGENCY ACTION
UNREASONABLY DELAYED**

Civil Case No. _____

Plaintiff John Doe, by and through undersigned counsel, alleges as follows:

## I.    INTRODUCTION AND SUMMARY

1.    John Doe seeks relief from this Court that may mean the difference between life and death for himself.

2.    John Doe voluntarily assisted with the U.S.-led reconstruction efforts following the withdrawal of U.S. troops in Iraq, and has received numerous recommendations for his work in connection therewith.  But this assistance has come at a significant cost to John Doe and his loved ones.  Because of his work, John Doe is a target for those who seek to intimidate, harm, and kill those who have assisted the U.S. in its reconstruction efforts.

3.    John Doe is an Iraqi citizen currently residing in Erbil, Iraq.  On August 10, 2011, John Doe's wife began working for the Inma Agribusiness Program, which was funded by the United States Agency for International Development (USAID).  As a result of that work, she and John Doe were forced to flee from their home in Baghdad to Erbil, Iraq due to serious threats to their lives.

4.    For over two years, since fleeing to Erbil, John Doe has worked for programs funded by USAID in furtherance of the U.S.-led reconstruction efforts following the withdrawal of U.S. troops from Iraq.  During this time, John Doe has risked his life alongside U.S. personnel to rebuild Iraq's infrastructure.  By helping with the U.S. reconstruction efforts, John Doe has knowingly placed himself, his wife, and his small child in danger.  If John Doe's service to the United States were to become fully known in Iraq, he would likely be killed by persons opposed to the United States and to the Iraqis who have assisted the United States.  Although John Doe and his family have been granted temporary residence in Erbil, which is in the Kurdistan region of Iraq, there is no guarantee that they will be permitted to remain there, and the dangers they

face have increased exponentially in recent months with the aggression and terrorist activity of the group known as the Islamic State in Iraq and the Levant (ISIL).

5.     Congress has recognized the special risks faced by Iraqis in John Doe's position.  In particular, in 2007, Congress enacted the Refugee Crisis in Iraq Act of 2007 and created priority processing through the U.S. Refugee Admissions Program (USRAP) pursuant to Section 1243, to facilitate resettlement in the United States of Iraqis whose employment by or on behalf of the United States has put them at risk.  Family members of those who meet this criteria also are eligible for priority processing through USRAP if they too are at risk of harm because of their relative's work by or on behalf of the U.S. Government.

6.     John Doe first sought protection from the U.S. Government through his application for emigration to the United States with the U.S. Refugee Admissions Program (USRAP).

7.     On April 8, 2010, John Doe requested to be added to his sister's USRAP application out of fear for his own safety after members of his family were threatened and physically assaulted because of their work for the U.S. Government.  John Doe provided all necessary documentation and took all steps necessary for his USRAP application, including attending his Department of Homeland Security (DHS) interview.  On September 22, 2010, he was notified that his case was deferred and would continue to be processed.  Despite continued assurances that his case is being processed, John Doe has yet to receive a decision on his USRAP application.  As of the filing of this complaint, it has been *over five years and four months* since John Doe first submitted his USRAP application.  *Over five years* have elapsed since John Doe attended his DHS interview. In addition, it has now been *over four years and eleven months* since John Doe was notified that his application was deferred for further processing.

8.      John Doe has exhausted his efforts to work with Defendants to receive a timely decision

on his USRAP application.  John Doe, through his attorney, has contacted both the Department

of State Refugee Coordinator in Baghdad and the International Organization for Migration

(IOM) and filed a CIS Ombudsman Form DHS-7001 with DHS in order to expedite his case.

Following repeated requests for information concerning his application, John Doe has been told

that his case is "currently pending U.S. government security reviews" and that because "this

process is under the authority of various agencies in the United States," the IOM is "unable to

predict when the security checks might be completed."

9.      Pursuant to Section 1244 of the Refugee Crisis in Iraq Act of 2007, Congress also created

a Special Immigrant Visa (SIV) for Iraqis who had worked by or on behalf of the U.S.

Government for at least one year, and whose employment by or on behalf of the United States

has placed them in grave danger.  *See* Refugee Crisis in Iraq Act (2007), 8 U.S.C. § 1157 note.

10.     Dissatisfied with Defendants' failure to implement the SIV program in a timely fashion

and concerned by the extreme risks faced by Iraqis who aided the United States in Iraq, Congress

subsequently passed additional legislation creating stricter timelines for Defendants' processing

of Iraqi SIV applications and imposing related reporting requirements on Defendants.

11.     In December 2013, Congress passed legislation mandating an "Improved Application

Process" for Iraqi SIVs. This law requires that the Departments of State, Homeland Security and

Defense, within 120 days after passage of the legislation, "improve the efficiency by which

applications for special immigrant visas under section 1244(a), are processed so that all steps

under the control of the respective departments incidental to the issuance of such visas, including

required screenings and background checks, should be completed *not later than 9 months* after

the date on which an eligible alien submits all required materials to complete an application for

such visa." *See* 8 U.S.C. § 1157 note at § 1242(c)(1) (emphasis added); Pub. L. No. 113-66, div.

A, title XII, § 1218, Dec. 26, 2013, 127 Stat. 910.

12.     Finding himself with a deferred USRAP application and with no indication that he would

receive a timely response to the application, John Doe sought to avail himself of the protections

offered by the SIV program.  On August 11, 2012, John Doe's wife submitted on behalf of

herself and John Doe all documents needed to obtain Chief of Mission Approval (COM

Approval).  COM Approval was granted on June 17, 2013, and John Doe submitted all necessary

documentation for the SIV application (the SIV Application) on August 15, 2013.  On November

19, 2013, John Doe attended his visa interview at the U.S. Embassy.

13.     As of the filing of this Complaint, it has been ***over three years*** since John Doe first filed

his papers for COM Approval.  Over ***two years*** have elapsed since John Doe submitted his SIV

Application materials.  In addition, it has now been ***over one year and nine months*** since John

Doe completed his interview, the final step in his application process.

14.     John Doe has exhausted efforts to work with Defendants to receive a timely decision on

his SIV Application.  Following repeated requests for information concerning his application,

John Doe has been told by the U.S. Embassy on several occasions that his case remains in

"additional administrative processing" and that no estimate of how long it will take to complete

such processing can be provided.

15.     Defendants' substantial delay in processing John Doe's SIV Application is not only

unreasonable, but egregious—particularly given the dangerous situation faced by John Doe.

Each day that John Doe remains in Iraq leaves him in mortal danger.  This danger increases by

the day as the security situation in Iraq deteriorates.  Additionally, John Doe's wife and child—

who have been issued SIVs—plan to travel to the United States on October 5, 2015 in advance of

the November 4, 2015 expiration of their visas.  By failing to make a decision on John Doe's

SIV application, Defendants have created another hardship for John Doe in forcing him to be left

behind and separated from his wife and young child.

16.     Given the urgency of John Doe's situation, and because Defendants have been

unresponsive to John Doe's repeated requests that his SIV Application be decided, John Doe has

no choice but to seek relief from this Court compelling Defendants to adjudicate his SIV

application.

## II.     JURISDICTION AND VENUE

17.     Jurisdiction is proper under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361

(mandamus), and 5 U.S.C. §§ 701-06 (Administrative Procedure Act).

18.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(e), because the Defendants

are federal agencies headquartered in the District of Columbia or officers of those agencies.

Furthermore, a substantial part of the events or omissions giving rise to the Complaint

necessarily occurred or failed to occur within the District of Columbia.

## III.    THE PARTIES

19.     John Doe is an Iraqi national presently residing in Erbil, Iraq.  From around June 2013 to

August 2014, John Doe served as a Provincial Model Clinic Support Coordinator for the Primary

Health Care Project, a USAID-funded program, in furtherance of the U.S.-led reconstruction

efforts in Iraq.  In October 2014, John Doe began work with the U.S.-based International

Medical Corps (IMC) as a Senior Medical Officer, overseeing USAID-funded projects that

provide health care to internally displaced people in and around Erbil.  John Doe remains

employed by IMC in this capacity.  As a result of his work on behalf of the U.S. Government,

John Doe's life is in danger.

20.     Defendant United States Department of State is an agency of the United States and shares responsibility with Defendant United States Department of Homeland Security (DHS) for the administration of the Iraqi SIV program pursuant to the Refugee Crisis in Iraq Act of 2007.

21.     Defendant John F. Kerry is the Secretary of State and exercises authority over the Department of State.  The Secretary of State, together with the Secretary of Homeland Security, is responsible for the administration of the Iraqi SIV program pursuant to the Refugee Crisis in Iraq Act of 2007.  Secretary Kerry is named as a defendant in his official capacity only.

22.     Defendant DHS is an agency of the United States and shares responsibility with Defendant Department of State for the administration of the Iraqi SIV program pursuant to the Refugee Crisis in Iraq Act of 2007.  U.S. Citizenship and Immigration Services (USCIS) is a component of DHS.

23.     Defendant Jeh Johnson is the Secretary of Homeland Security.  Defendant Johnson exercises authority over Defendant DHS.  The Secretary of Homeland Security, together with the Secretary of State, is responsible for the administration of the Iraqi SIV program pursuant to the Refugee Crisis in Iraq Act of 2007.  Secretary Johnson is named as a defendant in his official capacity only.

## IV.     THE IRAQI SPECIAL IMMIGRANT VISA PROGRAM

### A.     THE APPLICATION PROCESS FOR IRAQI SPECIAL IMMIGRANT VISAS

24.     Concerned about the unique dangers faced by Iraqis who had helped the United States at risk to their own lives and those of their families, Congress enacted the Refugee Crisis in Iraq Act of 2007, Pub. L. 110-181, 122 Stat. 395 (Jan. 28, 2008) (the "Act"), as part of the 2008 National Defense Authorization Act to help individuals in Plaintiff's predicament.  Under the Act, an SIV may be granted, subject to numerical limitations, to an applicant who:

        (A)     is a citizen or national of Iraq;

(B)     was or is employed by or on behalf of the United States Government in Iraq, on or after March 20, 2003, for not less than one year;

(C)     provided faithful and valuable service to the United States Government, which is documented in a positive recommendation or evaluation . . . from the employee's senior supervisor or the person currently occupying that position, or a more senior person, if the employee's senior supervisor has left the employer or has left Iraq; and

(D)     has experienced or is experiencing an ongoing serious threat as a consequence of the alien's employment by the United States Government.

8 U.S.C. § 1157 note at § 1244(b)(1). Spouses and children of those who meet these requirements may also receive derivative visas. *See id.* at § 1244(b)(2). The application process for an SIV pursuant to this statutory authorization has several stages.

25.     First, a petitioner must receive approval from the Chief of Mission (COM) in Iraq, who "conduct[s] a risk assessment of the alien and an independent review of records maintained by the United States Government or hiring organization or entity to confirm employment and faithful and valuable service to the United States Government prior to approval of a petition under this section." *Id.* at § 1244(b)(4)(A).

26.     Second, having obtained COM Approval, the applicant must submit an I-360 form to the USCIS Service Center, for forwarding to the National Visa Center (NVC), accompanied by all required supporting documents.

27.     Third, once the I-360 petition is approved and sent to NVC, an applicant must submit to NVC additional required forms and documents on behalf of the applicant and all family members applying for a visa.

28.     Fourth, an applicant and all family members must undergo an interview at a U.S. consulate or embassy.

29.     Once these steps are completed, an application is ready for adjudication.  If the visa is granted, the applicant is then resettled in the United States.

### B.     CONGRESS'S AMENDMENT OF THE REFUGEE CRISIS IN IRAQ ACT TO COMPEL SPEEDIER ADJUDICATION OF APPLICATIONS FOR IRAQI SPECIAL IMMIGRANT VISAS

30.     Aware of the life-threatening delays faced by Iraqi SIV applicants, and dismayed by Defendants' failure to implement the program in a timely fashion, in 2013 Congress amended the Refugee Crisis in Iraq Act to mandate an "Improved Application Process" for the Iraqi SIV program.

31.     The 2013 amendments direct Defendants that all steps in the processing of each SIV application "should be completed not later than 9 months after the date on which an eligible alien submits all required materials."  *See* 8 U.S.C. § 1157 note at § 1242(c)(1).

32.     Congress underscored the importance of its specified nine-month processing time by requiring Defendant Departments, within 120 days of the enactment of the 2013 amendments and quarterly thereafter, to report to Congress and to the public the number of SIV applications that had not been adjudicated within the nine-month time period, the specific reasons for the failure to adjudicate those cases within that period, and the number of backlogged applications at each stage of the process.  *See* 8 U.S.C. § 1157 note at §§ 1248(f), (g).

33.     Congress further acknowledged the serious dangers faced by Iraqi SIV applicants by requiring the Department of State to make "a reasonable effort" to provide SIV applicants "with protection" while in Iraq, including "immediate removal from Iraq, if possible, of such alien if . . . such alien is in imminent danger."  *See* 8 U.S.C. § 1157 note at § 1244(e).  Upon information and belief, Defendants have failed to implement this statutory mandate to protect Iraqi SIV applicants.  As far as Plaintiff has observed, U.S. Government protection for SIV applicants is nonexistent.

## V.    PLAINTIFF'S BACKGROUND

### A.    PLAINTIFF'S SERVICE ON BEHALF OF THE U.S. GOVERNMENT, AND THE RECOGNITION AND PRAISE THEREOF

34.    John Doe is an Iraqi citizen and currently resides in Erbil, Iraq.  He and his family previously resided in Baghdad, Iraq.

35.    John Doe's wife worked in Baghdad as a program administrator for the USAID-funded Inma Agribusiness Program—a program to support the development of agribusiness and agriculture markets in Iraq—from August 10, 2011 to November 1, 2012.

36.    John Doe and his family were forced to flee from Baghdad to Erbil in March 2012 after they received threats against their lives because of John Doe's wife's work for the U.S. Government.  After fleeing to Erbil, John Doe—a dentist by training—sought to improve the lives of those around him by working on USAID-funded projects aimed at increasing the availability of primary health care to internally displaced people.

37.    For over a year—from June 2013 to August 2014—John Doe served as a Provincial Model Clinic Support Coordinator with the Primary Health Care Project in Iraq, a USAID-funded program, in furtherance of the U.S.-led reconstruction effort following the withdrawal of U.S. troops from Iraq.  As part of his service, John Doe worked to improve access to primary health care in and around Kirkuk, Iraq by coordinating health clinics, training clinic staff, and conducting health surveys.

38.    Beginning in October 2014, and continuing to the present, John Doe has served as a Senior Medical Officer for International Medical Corps (IMC) on USAID-funded projects.  As part of his service, John Doe's responsibilities include planning, development, implementation, oversight, monitoring, and reporting for two IMC projects: static, camp-based medical clinics and mobile medical units that move throughout displaced populations in and around Erbil.

39.     Throughout John Doe's work for the Primary Health Care Project and IMC, he and his

colleagues have been under constant threat of attack from insurgents who wish to harm and kill

those assisting the U.S. with its vital reconstruction efforts.

40.     Despite the ever-present danger to his life and those around him, John Doe has

persevered in his duties, thereby earning the respect and praise of the U.S. personnel with whom

he has worked on a daily basis.

41.     For example, in a letter provided by the Health Program Manger of IMC in Iraq, Caitlin

McNary stated:

> [John Doe] was identified for the position due to his technical
> expertise as well as extensive experience working with primary
> health care. In the role [John Doe] has excelled due to his
> technical expertise as well as his flexibility, enginuity [sic], and
> dedication to his work. [John Doe] has shown willing [sic] to go
> above and beyond, putting in extra time and effort to ensure that
> services are being provided to those in most need. He continually
> shows himself to be solution oriented heading off potential issues
> before they occur, and advocating for those he oversees and
> manages to ensure they have the support they need to do their
> work. He is diplomatic in his approach to both colleagues as well
> as stakeholders and officials, and is able to effectively
> communicate and work with individuals of all races, backgrounds,
> genders, and religions. In all, [John Doe] is a pleasure to work and
> be around [sic], while also being highly effective at his work.
>
> As his supervisor, I highly recommend [John Doe] for
> consideration for the SIV program. [John Doe]'s dedication to
> both his work as well as humanitarianism has shown him to be a
> person of upstanding character and ethics who is invested in
> making a contribution to the community in which he lives. I
> believe that should he be provided the opportunity to do so, he
> would make such a contribution to the United States.

42.     In a letter provided by the Director of the Department of Mental Health and Social

Services for IMC in Iraq, Stacy S. Lamon stated:

> During the time that [John Doe] has been with IMC, his
> responsibilities have included planning, development,

implementation, oversight, monitoring and reporting.  In addition, because of a lack of senior staff at times, he has willingly gone beyond the requirements of his job to ensure the effective management and oversight of IMC programming and IMC services.  Never has he declined a request to perform duties beyond what is required of him and, further, [John Doe] readily takes the initiative to put-in that extra effort that ensures a job-well-done.  Because of the nature of this work, many times I and others have contacted him on his days-off or late at night.  In every case, he responded readily and without complaint.

Throughout my career, with only a few exceptions, I have been fortunate to work with truly great staff.  [John Doe] has continued my good fortune.  He is energetic, highly resourceful, responsible, dedicated and utterly trustworthy.  In regard to his attitude, he is always positive even in some of the direst situations.  In that regard he willingly works with some of the most destitute and disenfranchised refugees and IDPs, in situations that have great potential for danger – and he does so without complaint or hesitancy.

B.   **THE THREATS TO PLAINTIFF AND HIS LOVED ONES BECAUSE OF SERVICE ON BEHALF OF THE U.S. GOVERNMENT**

43.   Notwithstanding the efforts made to conceal his work for the United States, John Doe is in grave danger in Iraq, and lives under a constant threat of exposure and recognition.  John Doe and his family are at risk from terrorist groups and militias who are hostile to U.S. forces and the Iraqi government.

44.   Indeed, individuals who "collaborated" with the U.S. are viewed with great suspicion, even hatred, throughout Iraq and the wider Middle East.

45.   The security situation in Iraq has only deteriorated in recent years.  The last U.S. troops deployed as part of Operation Iraqi Freedom were withdrawn in January of 2012.

46.   In early 2012, John Doe and his family received a threat from an individual who was hired to drive John Doe's wife to work at the USAID-funded Inma Agribusiness Program in Baghdad.  Though John Doe and his wife attempted to conceal his wife's employment with a U.S.-funded project, the nature of her work became known to the driver.  On a number of

occasions, the driver questioned John Doe's wife regarding her work and demanded that she cease working for the "enemy." This finally escalated to a confrontation with John Doe in which the driver demanded that John Doe's wife cease working for the U.S. Government. John Doe and his wife understood that a failure to comply with the driver's demand would put their lives at risk. The driver knew where John Doe's wife worked. The driver knew where John Doe and his wife lived.

47.     The driver's threat followed several threats and acts of violence against extended family members over the preceding years due to affiliation with the U.S. reconstruction effort in Iraq. In early 2005, John Doe's sister and her husband were assaulted by gunmen while they were travelling to a doctor's appointment. Both were shot, but miraculously survived. In 2006, John Doe's sister and her husband received a threatening letter at their home and then, in 2009, they received a threatening phone call in which the caller threatened to kidnap their son because of her work for the U.S. Government.

48.     Because of the risk to their lives, in March 2012, John Doe and his wife fled to Erbil, Iraq. In August 2012, John Doe's wife notified the U.S. Embassy of this threat, stating in a letter:

> I've been working with USA company trying to improve the quality of living for the Iraqi People, but I found myself facing the threaten of being killed, and I can't live me and my family a normal life any more in Iraq.
>
> I had to escape to Erbil me and my family, my life is not normal anymore. I dream to live my life normally again without the fear of being killed or kidnaped [sic].

49.     Since that time, Iraq has slipped into sectarian civil war, pitting Sunni extremists and factions from the Syrian civil war against an increasingly repressive Iraqi government dominated by Shiite factions and Iran. Adding to this instability and danger is the fact that ISIL has

successfully overtaken, and continues to hold, a significant amount of territory in Iraq.  Within this volatile environment, terrorist groups and militias who are hostile to U.S. forces and the Iraqi government have resumed their threats against individuals who have assisted the U.S. Government.

50.     Even since fleeing to Erbil, John Doe has encountered individuals seeking to intimidate him because of his affiliation with the U.S. Government.  While working for the Primary Health Care Project, John Doe was approached by an individual at a clinic who indicated that that his work with the U.S. Government was "haram," a sort of "forbidden" action in Islam.  John Doe was then watched for the rest of his time at the clinic and chased by a number of cars on his trip home from Erbil.

51.     Because of the continuing threats to his life, John Doe implemented several safety precautions while working for the Primary Health Care Project.  He travelled varying routes to work, avoided a regular schedule, limited the number of people who knew his travel plans, and denied any affiliation with the U.S., instead stating that he worked for the Iraqi Ministry of Health.

52.     Though John Doe has continued to conceal his affiliation with the U.S., the nature of his occupation has made this difficult.  In his work for the IMC, John Doe currently oversees— among other things—a mobile medical unit that brings primary health care to the displaced populations in and around Erbil.  He must travel throughout the city with a medical unit that brandishes the IMC and USAID emblems.  As such, John Doe has been associated with the U.S., which has placed him and his family at great risk.

53.    Additionally, ISIL has rapidly advanced and taken over substantial portions of territory throughout Iraq.  John Doe's assistance to the U.S. makes him a target of ISIL, and, if ISIL were to gain control of a region in which he resides, it is very possible that he would be killed.

54.    Though John Doe has sought refuge in Erbil, he has only been granted temporary residence in the Kurdistan region of Iraq.  Currently, he is required to renew his residency on a yearly basis.  With the impending departure of his wife and child to the United States, and with growing hostility in Kurdistan against those who are ethnically Arab, John Doe—as an Arab male without a family—may face significant difficulty in renewing his residency.  Should John Doe's upcoming request to renew his residency be denied by regional authorities, he would be forced to relocate to another, more dangerous region of Iraq where his life would be in greater peril than it already is.

## VI.    DEFENDANTS' UNREASONABLE DELAY IN ADJUDICATING PLAINTIFF'S USRAP AND SIV APPLICATIONS

55.    On April 8, 2010, John Doe requested to be added to his sister's USRAP application out of fear for his own safety after his sister and her family—who worked for the U.S. Government—had been threatened and physically assaulted several times in the preceding years. On May 2, 2010, he was notified that his request was granted.

56.    John Doe attended his DHS interview at the U.S. Embassy in Baghdad on August 7, 2010.

57.    On September 22, 2010, John Doe received a "DHS Decision Letter," notifying him that his case was deferred and would continue to be processed.

58.    It has now been *over five years and four months* since John Doe submitted his USRAP application.

59.    It has now been *over five years* since John Doe attended his DHS interview.

-15-

60.     In has now been ***over four years and eleven months*** since John Doe was notified that his application was deferred for further processing.

61.     On August 11, 2012, John Doe's wife filed an application for COM Approval, the first step in the Special Immigrant Visa process.  John Doe's wife worked for the Inma Agribusiness Program, assisting the U.S. in connection with the reconstruction efforts in Iraq.  Her decision to file an SIV application followed threats to John Doe's and her life, and numerous assaults against their extended family, because of their assistance to the U.S. Government.

62.     COM approval was granted on June 17, 2013.

63.     Shortly after the receipt of COM approval, on August 15, 2013, John Doe and his wife submitted their complete SIV application materials.

64.     On November 19, 2013, John Doe and his wife attended their visa interviews in connection with their SIV Applications at the U.S. Embassy in Baghdad.

65.     On May17, 2015—after an attorney for John Doe inquired regarding the status of his application—John Doe, his wife, and his child were notified by U.S. Embassy officials that they were being granted Special Immigrant Visas.  They were asked to provide updated documentation and to attend an interview in Baghdad.   John Doe and his family provided the Embassy with all requested documents and traveled to Baghdad—despite the danger of violence they faced from travelling through Iraq—because they understood that their visas would be issued and they would soon be resettled in the United States.  Following their interview, Embassy officials even congratulated the family on the issuance of their visas.  However, soon after leaving the Embassy, John Doe was notified that he remained in administrative processing and that visas would only be issued to his wife and child.

66.     On May 26, 2015, John Doe's wife requested that Special Immigrant Visas be issued to her and their child and, on June 29, 2015, they were notified that the visas had been issued.

67.     It has now been ***over three years*** since John Doe filed his papers for COM Approval.

68.     It has now been ***over two years*** since John Doe submitted his SIV application materials.

69.     It has now been ***over one year and nine months*** since John Doe completed his visa interview at the U.S. Embassy in Iraq, which should have been the final step in his application process, and should have shortly preceded the issuance of his SIV.

70.     The Defendants' failure to make a determination on John Doe's SIV not only demonstrates utter disregard for his precarious situation, but has also created an additional hardship as his wife and child will be forced to start a new life in a strange country without him.

## VII.    CLAIMS FOR RELIEF

### COUNT 1

**Mandamus to Compel Officers and Agencies of the United States to Perform a Duty Owed to Plaintiff, against all Defendants (pursuant to 28 U.S.C. § 1361)**

71.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

72.     The Refugee Crisis in Iraq Act of 2007 imposes a mandatory and nondiscretionary duty on Defendants to adjudicate Plaintiff's SIV application; the Administrative Procedure Act (APA), 5 U .S .C § 555(b) obliges Defendants to do so within a reasonable time.

73.     The question of whether agency delay is "unreasonable" is informed by Congressionally imposed timeframes and deadlines.  In this case, Congress has clearly indicated, through the 2013 amendments to the Refugee Crisis in Iraq Act, that agency delay of more than nine months is unreasonable.

74.     Defendants have failed to adjudicate Plaintiff's SIV Application within a reasonable time.

75.     Plaintiff has exhausted efforts to compel Defendants to act on his SIV Application, and has no other means to compel Defendants to perform the duty owed to him.

76.     Defendants' unreasonable and unlawful delay in adjudicating Plaintiff's SIV Application has caused and continues to cause significant harm to Plaintiff, including, without limitation, placing Plaintiff and Plaintiff's family under what Defendants—through the Chief of Mission in Iraq—have admitted to be a "serious threat" to life and well-being that is "a consequence of" Plaintiff's service to the United States.

77.     In view of the foregoing, Plaintiff is entitled to a mandamus pursuant to 28 U.S.C. § 1361 compelling Defendants to adjudicate his SIV Application forthwith and without any further delay.

## COUNT 2

### Mandamus to Compel Officers and Agencies of the United States to Perform a Duty Owed to Plaintiff, against all Defendants (pursuant to 5 U.S.C. § 706(1))

78.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

79.     The APA, 5 U.S.C. § 555(b), obliges Defendants to adjudicate Plaintiff's SIV Application within a "reasonable time."

80.     The question of whether agency delay is "unreasonable" is informed by Congressionally imposed timeframes and deadlines.  In this case, Congress has clearly indicated, through the 2013 amendments to the Refugee Crisis in Iraq Act, that agency delay of more than nine months is unreasonable.

81.     Defendants have failed to adjudicate Plaintiff's SIV Application within a reasonable time.

82.     Pursuant to the APA, 5 U.S.C. § 702, a person adversely affected by agency action is entitled to judicial review.  Agency action includes a failure to act.  5 U.S.C. § 551(13).

83.     Defendants' unreasonable and unlawful delay in adjudicating Plaintiff's SIV Application

has caused and continues to cause significant harm to Plaintiff, including, without limitation,

placing Plaintiff and Plaintiff's family under what Defendants—through the Chief of Mission in

Iraq—have admitted to be a "serious threat" to life and well-being that is "a consequence of"

Plaintiff's service to the United States.

84.     The APA, 5 U.S.C. § 706(1), authorizes this Court to "compel agency action unlawfully

withheld or unreasonably delayed."

85.     Plaintiff has exhausted efforts to compel Defendants to act on his SIV Application, and

has no other means to compel Defendants to perform the duty owed to him.

86.     In view of the foregoing, Plaintiff is entitled to relief pursuant to 5 U.S.C. § 706(1)

compelling Defendants to adjudicate his SIV Application forthwith and without further delay.

## VIII.   PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that this Court:

A.      Issue a mandamus pursuant to 28 U.S.C. § 1361 directing Defendants to adjudicate

Plaintiff's application for Special Immigrant Visa within fourteen (14) days from the issuance

thereof;

B.      Issue judgment pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(1),

compelling Defendants to adjudicate Plaintiff's application for Special Immigrant Visa within

fourteen (14) days from the issuance thereof;

C.      Retain jurisdiction over this action and any attendant proceedings until Defendants have

fully and completely adjudicated Plaintiff's application for Special Immigrant Visa and

communicated the results of such adjudication to Plaintiff and the Court;

D.      Award Plaintiff his attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

E.      Award Plaintiff such other relief as the Court deems just and proper.

Respectfully submitted, this 10th day of September, 2015.

Marcia T. Maack (D.C. Bar No. 467035)
Miriam R. Nemetz
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006-1101
(202) 263-3397 (tel) | (202) 263-5397 (fax)
mmaack@mayerbrown.com
mnemetz@mayerbrown.com

Michael J. Word
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600 (tel) | (312) 701-9342 (fax)
mword@mayerbrown.com

Robert C. Double
MAYER BROWN LLP
350 South Grand Avenue, 25th Floor
Los Angeles, California 90071
(213) 229-9500 (tel) | (213) 625-0248 (fax)

*Counsel for Plaintiff*